**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Reed Rotondo, | No. CV-24-00005-PHX-JAT |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Pending before the Court is Plaintiff Reed Rotondo's appeal from the Commissioner of the Social Security Administration's ("SSA," "Commissioner," or "Defendant,") denial of Social Security benefits. (Doc. 13). The appeal is fully briefed (Doc. 13; Doc. 17; Doc. 18), and the Court now rules.

## I. BACKGROUND

The issues presented in this appeal are whether the ALJ committed materially harmful error by (1) failing to include Plaintiff's upper extremity limitations resulting from his peripheral neuropathy in the RFC; (2) inappropriately dismissing RN Farmer's "medical opinion"; and (3) failing to meet her burden at Step Five in the sequential disability evaluation process. (Doc. 13 at 4, 6, 7).

### A. Factual Overview

Plaintiff was 37 years old on his alleged disability onset date. (*Id.* at 2). He has a college education and a history of past relevant work as a commercial designer, technology training coordinator, and vocational instructor. (Doc. 9-3 at 38). Plaintiff filed his disability

insurance benefits (DIB) application on May 12, 2020, alleging disabilities beginning on April 29, 2020. (Doc. 13 at 1). On July 27, 2021, and March 4, 2022, Plaintiff testified in telephonic hearings before an ALJ. (*Id.*) The ALJ denied Plaintiff's claim on November 4, 2022. (*Id.* at 2). On November 6, 2023, the SSA Appeals Council denied Plaintiff's request for review of that decision and adopted the ALJ's decision as the agency's final decision. (*Id.*)

### B. The SSA's Five-Step Evaluation Process

To qualify for social security disability insurance benefits, a claimant must show that he "is under a disability." 42 U.S.C. § 423(a)(1)(E). To be "under a disability," the claimant must be unable to engage in "substantial gainful activity" due to any medically determinable physical or mental impairment. *Id.* § 423(d)(1). The impairment must be of such severity that the claimant cannot do his previous work or any other substantial gainful work within the national economy. *Id.* § 423(d)(2). The SSA has created a five-step sequential evaluation process for determining whether an individual is disabled. *See* 20 C.F.R. § 404.1520(a)(1). The steps are followed in order, and each step is potentially dispositive. *See id.* § 404.1520(a)(4).

At Step One, the ALJ determines whether the claimant is engaging in "substantial gainful activity." *Id.* § 404.1520(a)(4)(i). "Substantial gainful activity" is work activity that is (1) "substantial," i.e., doing "significant physical or mental activities"; and (2) "gainful," i.e., usually done "for pay or profit." 20 C.F.R. § 416.972(a)–(b). If the claimant is engaging in substantial gainful work activity, the ALJ will find the claimant is not disabled. *Id.* § 404.1520(a)(4)(i).

At Step Two, the ALJ determines whether the claimant has "a severe medically determinable physical or mental impairment" or severe "combination of impairments." *Id.* § 404.1520(a)(4)(ii). To be "severe," the claimant's impairment must "significantly limit" the claimant's "physical or mental ability to do basic work activities." *Id.* § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments, the ALJ will find the claimant is not disabled. *Id.* § 404.1520(a)(4)(ii).

At Step Three, the ALJ determines whether the claimant's impairment(s) "meets or equals" an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Part 404. *Id.* § 404.1520(a)(4)(iii). If so, the ALJ will find the claimant is disabled, but if not, the ALJ must assess the claimant's "residual functional capacity" ("RFC") before proceeding to Step Four. *Id.* §§ 404.1520(a)(4)(iii), 404.1520(e). The claimant's RFC is his ability perform physical and mental work activities "despite his limitations," based on all relevant evidence in the case record. *Id.* § 404.1545(a)(1). To determine RFC, the ALJ must consider all the claimant's impairments, including those that are not "severe," and any related symptoms that "affect what [the claimant] can do in a work setting." *Id.* §§ 404.1545(a)(1)–(2).

At Step Four, the ALJ determines whether the claimant has the RFC to perform the physical and mental demands of "his past relevant work." *Id*. §§ 404.1520(a)(4)(iv), 404.1520(e). "Past relevant work" is work the claimant has "done within the past 15 years, that was substantial gainful activity." *Id.* § 404.1560(b)(1). If the claimant has the RFC to perform his past relevant work, the ALJ will find the claimant is not disabled. *Id.* § 404.1520(a)(4)(iv). If the claimant cannot perform his past relevant work, the ALJ will proceed to Step Five in the sequential evaluation process.

At Step Five, the final step, the ALJ considers whether the claimant "can make an adjustment to other work," considering his RFC, age, education, and work experience. *Id.* § 404.1520(a)(v). If so, the ALJ will find the claimant not disabled. *Id.* If the claimant cannot make this adjustment, the ALJ will find the opposite. *Id.*

### C. The ALJ's Application of the Factors

Here, at Step One, the ALJ concluded that the record established that Plaintiff had not engaged in substantial gainful activity since April 1, 2018, the alleged onset date. (Doc. 9-3 at 25).

At Step Two, the ALJ determined that Plaintiff had the following severe impairments: "lumbar degenerative disc disease; Ehlers-Danlos syndrome, hypermobility type; orthostatic hypotension; peripheral neuropathy; cannabinoid hyperemesis syndrome;

- 3 -

and protein S deficiency with history of superior mesenteric vein and subclavian vein thromboses." (*Id.*)

At Step Three, the ALJ found that Plaintiff did not have any impairment or combination of impairments that met or medically equaled a listed impairment in Appendix 1 to Subpart P of 20 C.F.F. Part 404. (*Id.* at 29). Subsequently, the ALJ determined that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and 416.967(a),

> except this person can lift and carry 20 pounds occasionally and 10 pounds frequently, sit for 3 hours at a time and 7 hours total out of an 8-hour day; stand for 1 hour at a time and 4 hours total out of an 8-hour day; and walk for 30 minutes at a time and 2 hours total out of an 8-hour day. He can frequently operate foot controls; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and frequently reach. This individual must avoid concentrated exposure to extreme temperatures and vibration and even moderate exposure to hazards, like dangerous moving machinery and unprotected heights. He is able to understand, remember, and carry out simple instructions and make simple, work-related decisions in a routine work setting, and perform tasks that do not involve fast-paced production requirements, like those found in assembly line work or fast-food restaurants during mealtimes.

(*Id.* at 31).

At Step Four, the ALJ determined that Plaintiff was unable to perform any past relevant work. (*Id.* at 38). At Step Five, the ALJ found that Plaintiff could make sufficient adjustments to perform a significant number of jobs in the national economy given his age, education, work experience, and RFC. (*Id.* at 39). Examples of such jobs included patcher, order clerk, information clerk, and document preparer. (*Id.*) Accordingly, the ALJ concluded that Plaintiff was not disabled as defined in the Social Security Act from the alleged onset date through November 4, 2022. (*Id.* at 40).

## II. LEGAL STANDARD

This Court may not set aside a final denial of disability benefits unless the ALJ's decision is "based on legal error or not supported by substantial evidence in the record."

*Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017) (quoting *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003)). "Substantial" evidence involves "more than a mere scintilla but less than a preponderance." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). Substantial evidence is relevant evidence that "a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988)). The Court, in its review, must consider the record in its entirety, "weighing both the evidence that supports and evidence that detracts from the [ALJ's] conclusion." *Id.* (quoting *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2007)).

The ALJ—not this Court—is responsible for resolving ambiguities, resolving conflicts in medical testimony, determining credibility, and drawing logical inferences from the medical record. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (citing *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989); *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)). Therefore, when the evidence of record could result in more than one rational interpretation, "the ALJ's decision should be upheld." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) ("When the evidence before the ALJ is subject to more than one rational interpretation, [the Court] must defer to the ALJ's conclusion."). Further, this Court may only review the reasons the ALJ provides in the disability determination; it "may not affirm the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010.

**III.  DISCUSSION**

Plaintiff claims that the ALJ committed materially harmful legal error, based on the following allegations: (1) the ALJ failed to include upper extremity limitations resulting from Plaintiff's peripheral neuropathy in the RFC; (2) the ALJ's dismissal of RN Farmer's "medical opinion" was inappropriate; and (3) the ALJ failed to prove Plaintiff can perform other work existing in significant numbers in the national economy. (Doc. 13 at 4, 6, 7). The Court examines each claim in turn.

**A.  RFC and Upper Extremity Limitations**

Plaintiff argues that the ALJ committed "harmful, reversible, error" because despite finding peripheral neuropathy to be a severe impairment, the ALJ did not include in the RFC any limits regarding Plaintiff's upper extremity limitations—specifically, those involving his "ability to use his hands for fingering, feeling[,] or grasping." (Doc. 13 at 4). Plaintiff asserts that the ALJ instead "focused on the limitations she placed on the plaintiff's ability to stand, walk, and perform postural maneuvers which would account for how the neuropathy impacts his lower extremities," failing to discuss "why there were no assigned limitations to account for the neuropathy in his dominant hand." (Doc. 13 at 5).

In his opening brief, as grounds for including hand limitations in the RFC, Plaintiff points to "objective testing in the form of electromyography and nerve conduction studies," which confirm "the existence of peripheral neuropathy in [Plaintiff's] right upper and lower extremities." (Doc. 13 at 4). Plaintiff also points to his administrative hearing testimony that he "experiences pins and needles in his hands," that gabapentin "numbs out his hands," and that he has "issues with dropping things," as well as his wife's testimony regarding his "inability to hold onto items." (Doc. 13 at 4).

The ALJ clearly considered the above evidence, writing in her decision the following:

> A November 2019 electromyography revealed the presence of peripheral neuropathy. (See, e.g., Ex. 4F at 24-28). The claimant reports his neuropathic attacks consist of a feeling of pins and needles *in his hands* and feet with sluggishness, impaired gait, memory issues, and difficulty concentrating. (See, e.g., Ex. 4F at 7; 5F at 1). Providers did, on occasion, find *paresthesia in his distal extremities*. (Ex. 12F at 7).

(Doc. 9-3 at 35) (emphasis added).

As to Plaintiff's argument that the ALJ failed to discuss "why there were no assigned limitations to account for the neuropathy in [Plaintiff's] dominant hand" (Doc. 13 at 5), the Court disagrees. Regarding Plaintiff's peripheral neuropathy as it pertains to his RFC, the ALJ wrote as follows:

> Given maximum consideration to the claimant's allegations of gait impairment, sluggishness, and *dysthesias*, the residual functional capacity limits the claimant's exertional and postural activities in the workplace. *Greater limitations are not warranted, however, as treatment records regularly revealed normal sensation.* (See, e.g., Ex. 5F at 3; 10F at 3).... Additionally, reports to treaters indicated that he found Gabapentin beneficial. (Ex. 12F at 6). *Significantly, the claimant reported 75 percent improvement in his symptoms with his medications* and stated he was tolerating them well. (Ex. 18F at 7). *Overall, the apparent relief with conservative treatment and frequency of grossly normal findings demonstrate that this impairment and its effects are not as intense, persistent, or limiting as he alleges. Therefore, additional limitations are not warranted for this impairment.*

(*Id.*) (emphasis added). Here, the ALJ considered the Plaintiff's neuropathy, including the dysthesias in his hands, and consequently included limitations of exertional and postural activities in Plaintiff's RFC. (*Id.*) The ALJ then explained, however, that treatment records revealing normal sensation and evidence of significant improvement of Plaintiff's symptoms with medication suggested that the effects of Plaintiff's peripheral neuropathy—including those impacting his upper extremities—were "not as intense, persistent, or limiting as [Plaintiff] alleges." (*Id.*) Based on this substantial evidence, the ALJ appropriately concluded that "additional limitations are not warranted." (*Id.*)

Moreover, the ALJ cites additional evidence in support of her decision not to include additional upper extremity limitations in the RFC. In determining the RFC, the ALJ considered the findings of two State agency medical consultants and the medical opinions of Plaintiff's treating physician, Dr. John Daller. (*Id.* at 37–38). Both State consultants identified peripheral neuropathy as one of Plaintiff's impairments, yet opined that Plaintiff has no manipulative limitations. (Exs. 2A at 7; 4A at 12). Dr. Daller opined that Plaintiff could perform "Handling," "Fingering," and "Feeling" with both hands "Continuously" over the course of a workday. (Exs. 33F at 4; 35F at 4). The ALJ found the State consultants' opinions to be "generally persuasive" and Dr. Daller's opinion to be "most

persuasive" in part because these opinions were consistent with longitudinal evidence in Plaintiff's medical record revealing normal "strength, sensation, and range of motion … in spite of [Plaintiff's] impairments," including his peripheral neuropathy. (*Id.*). These medical opinions constitute substantial evidence in support of the ALJ's decision not to include additional upper extremity limitations in the RFC. *Thomas*, 278 F.3d at 954 (indicating that substantial evidence is relevant evidence that "a reasonable mind might accept as adequate to support a conclusion" and involves "more than a mere scintilla but less than a preponderance.") (internal citation omitted).

In his Reply Brief, for the first time, Plaintiff essentially argues that the evidence upon which the ALJ relied in her decision regarding the inclusion of upper extremity limitations in Plaintiff's RFC is insufficient. (*See* Doc. 18 at 2–4). Specifically, Plaintiff asserts that: (1) the ALJ's finding that "treatment records regularly revealed normal sensation" lacks "the significance the Commissioner tries to attach, because the "history of illness" in the treatment records to which the ALJ refers "focused on [Plaintiff's] symptomology and not his functional limitations" (Doc. 18 at 2); (2) because these records reflect the results of of examinations that "were performed via telehealth" due to "the COVID-19 pandemic," they "do not constitute substantial evidence" (*Id.* at 3); (3) the opinions of the State agency consultants and Dr. Daller lack sufficient rationale (*Id.* at 3–4); (4) a "normal" neurological exam that Dr. Daller cited to support his opinion was "not, in fact, normal" (*Id.*); and (5) the ALJ's reliance on the improvement in Plaintiff's neuropathy symptoms following Gabapentin administration "is flawed because [Plaintiff] reported that the side effects also make him slow and weak." (*Id.* at 4). However, Plaintiff failed to specifically assert any of these issues in his Opening Brief. (*see generally* Doc. 13). As such, this Court is under no obligation to take these issues into consideration. *Independent Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("[The Ninth Circuit] has repeatedly admonished that we cannot manufacture arguments for an appellant and therefore we will not consider any claims that were not actually argued in [an] appellant's opening brief. Rather, we review only issues which are argued

specifically and distinctly in a party's opening brief.") (internal citations and quotations omitted).

Furthermore, even if the Court were to address these additional issues, to the extent Plaintiff suggests an alternative reading of the record to support his argument for a more restrictive RFC, the Court must defer to the ALJ to resolve any conflicts in the evidence. *See Andrews*, 53 F.3d at 1039 (stating that the ALJ, not a reviewing court, is responsible for resolving ambiguities and resolving conflicts in the medical testimony and medical record, determining credibility, and drawing logical inferences). That there may be evidence that potentially supports an alternative assessment does not provide a basis for this Court to alter the ALJ's RFC determination under a deferential standard of review. *Orn*, 495 F.3d at 630 (stating that when the evidence of record could result in more than one rational interpretation, "the ALJ's decision should be upheld"); *Batson*, 359 F.3d at 1198 ("When the evidence before the ALJ is subject to more than one rational interpretation, [the Court] must defer to the ALJ's conclusion.").

Plaintiff also points to his administrative hearing testimony that he "experiences pins and needles in his hands," that gabapentin "numbs out his hands," and that he has "issues with dropping things"—as well as his wife's testimony regarding his "inability to hold onto items"—as additional grounds to incorporate upper extremity limitations into the RFC. (Doc. 13 at 4). However, the ALJ did not find Plaintiff's testimony regarding these symptoms to be credible. (Doc. 9-3 at 35) ("Overall, the apparent relief with conservative treatment and frequency of grossly normal findings demonstrate that this impairment and its effects are not as intense, persistent, or limiting as [Plaintiff] alleges."). Nor did she find believable Plaintiff's wife's testimony. (*Id.* at 33) ("While considered, these statements are not consistent with the objective findings in the medical record."). As Plaintiff did not specifically challenge the ALJ's determination regarding this testimony on appeal in his opening brief, the Court considers this issue waived. *Independent Towers of Washington*, 350 F.3d at 929 ("we cannot manufacture arguments for an appellant and therefore we will not consider any claims that were not actually argued in [an] appellant's opening brief")

(internal citation and quotation omitted); *Shaibi v. Berryhill*, 870 F.3d 874, 882 (9th Cir. 2017) (same).

Accordingly, the Court finds that in declining to include limitations regarding Plaintiff's use of his upper extremities in the RFC, the ALJ committed no harmful error.

### B. RN Farmer's "Medical Opinion"

Plaintiff also claims that the "the ALJ's dismissal of RN Farmer's medical opinion constitutes legal error" because she did not provide adequate justification for the dismissal. (Doc. 13 at 6). First, Plaintiff argues that the ALJ failed to "explain how [she] considered the supportability and consistency factors in reaching [her] findings." (*Id.*) (citing 20 C.F.R. § 404.1520c(b)(3)). Second, Plaintiff asserts that the ALJ's finding that RN Farmer's "opinion [was] unpersuasive due to no treatment notes from RN Farmer being submitted into the record" was inappropriate because the ALJ had a "heightened duty to develop the record." (*Id.* at 6–7).

During the administrative hearing on July 27, 2021, Plaintiff read a statement from his in-home nurse, Billy Ann Farmer, R.N., into the record, as follows:

> I met this patient in July of 2020 through a home health agency. His physician, Dr. Desai, ordered for this patient to have one to two liters of normal saline twice a week. And if I am not mistaken, that went up to three times a week if the patient required the hydration or medication Zofran for nausea. While taking care of this gentleman, I have yet to see him have a good seven days in a row. The day after his infusion, I will check in with him, and he typically will have a good day … on that day, but not always. I have been called out in several – symptoms [sic], and to keep the patient out of the COVID-filled emergency rooms. This patient lives with the nausea and abdominal pain on pretty much a daily basis. He reports this abdominal pain is stabbing or – and/or dull in the left lower quadrant, but also mid-abdominal. During episodes for this patient, the pain progresses to the right upper quadrant, right lung, and his right shoulder he also feels mid-sternal chest discomfort, blurred vision, aphasia, dizziness, and he may become verbally, but never physically aggressive. I have observed this patient on a Monday be pale, have poor skin

> color, clammy to the touch, and reporting pain. When the pain gets bad enough, he reports flu-like pain, both muscular discomfort and his skin hurts. Then by Thursday, I would observe the patient on the floor, weeping from pain in the fetal position. From what I can tell, this patient has lost around ten pounds at least in the last year, and this [is] just a visual assessment of actual weight. I can attest at this point in this patient's life, with what I have seen, he could not hold down a full-time job. He would have to call out a minimum of three-to-four times a week from what I've actually seen in person myself. I have also seen this patient have increased signs and symptoms of depression at times. He tries to stay strong but going through what I have seen him go through, I know this is both physically and mentally difficult. I do affirm that everything I have stated, I have seen for myself and know from first-hand knowledge due to caring for this gentleman.

(Doc. 9-3 at 52, 81–83).

The ALJ found RN Farmer's statement unpersuasive, stating the following:

> The written version of this statement is not in the record as it was not submitted by the claimant. (See, e.g., Ex. 20E). Nevertheless, the undersigned has considered the statement. However, no treatment records from Nurse Farmer were submitted. Because there are no treatment records to substantiate the statement, it is not persuasive. Any statement that the claimant is unable to work is a decision of disability reserved to the Commissioner and is therefore inherently neither valuable nor persuasive.

(*Id.* at 37).

Defendant argues that the ALJ properly found that RN Farmer's statement was not a medical opinion, but rather, "a statement on an issue reserved to the Commissioner." (Doc. 17 at 5). The Court agrees with Defendant. *See Martinez v. Astrue*, 261 Fed. App'x. 33, 35 (9th Cir. 2007) ("[T]the opinion that [a claimant] is unable to work is not a medical opinion, but is an opinion about an issue reserved for the Commissioner."). As discussed above, generally, under the revised 2017 SSA regulations, when reviewing an ALJ's

- 11 -

decision to reject a medical source's opinion, a court must determine whether the ALJ "considered the supportability and consistency factors" and, if so, whether substantial evidence supports the ALJ's decisions concerning those factors. *Woods*, 32 F.4th at 792. Yet, these requirements apply only to the ALJ's evaluation of medical opinions, and not all medical source statements qualify as opinions. *Windish v. Comm'r of Soc. Sec. Admin.*, No. CV-22-01162-PHX-DWL, 2023 WL 6568185, *7 (D. Ariz. Oct. 10, 2023) (citing *Hale v. Kijakazi*, CV 21-53-H-JTJ, 2022 WL 14654959, *6 (D. Mont. Oct. 25,2022) ("An ALJ must discuss statements by a medical source that qualify as 'medical opinions' … [but] is not required to address statements by a medical source that do not qualify as medical opinions.") (citations omitted)). The 2017 SSA regulations define a "medical opinion" as:

> A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities: ... (i) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching); (ii) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting; (iii) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and (iv) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

*Id.* (quoting 20 C.F.R. § 404.1513(a)(2)).

Here, RN Farmer's statement does not satisfy the statutory definition of a "medical opinion," because it does not describe what Plaintiff can still do despite his impairments. *Id.* (citing *Dorsey v. Comm'r of Soc. Sec. Admin.*, No. CV-22-01297-PHX-DWL, 2023 WL 6058505, *5 (D. Ariz. Sept. 18, 2023) ("The statement in Dr. Subbarao's treatment note does not qualify as a 'medical opinion' ... because it does not address Plaintiff's

- 12 -

functionality and merely describes the frequency ... of Plaintiff's headaches."); *Brayden B. v. Comm'r, Soc. Sec. Admin.*, No. 3:20-cv-1963-MO, 2023 WL 5606981, *4 (D. Or. Aug. 30, 2023) ("[The physician] did not provide any description of what Plaintiff could still do despite his urticaria. Nothing in the record or Plaintiff's briefing shows where [the physician] identified what Plaintiff can do despite his limitations; the sum total of the opinion is that his urticaria and dermatitis 'keep him from working.' Because that is not a 'medical opinion' that requires independent analysis under the regulations, the Court finds the ALJ did not err by failing to analyze [the physician's] opinion.") (citations omitted); *Rodin v. Comm'r of Soc. Sec.*, Case No. 1:21-cv-00900-SAB, 2023 WL 3293423, *18–19 (E.D. Cal. May 5, 2023) ("[N]otably absent are specific opinions concerning what Plaintiff is capable of doing, and specific functional limitations.... Accordingly, the Court finds the ALJ was not required to evaluate [the physician's] treatment notes as a 'medical opinion' under the relevant regulations.").

Consequently, the Court agrees with Defendant's assertion that RN Farmer's statement regarding Plaintiff did not constitute a "medical opinion." Thus, although the ALJ chose to discuss RN Farmer's statement in her written decision, she was not required to do so, nor was she required to articulate how supportability and consistency factors, supported by substantial evidence, influenced her decision to reject the statement. 20 C.F.R. § 404.1520b(c)(3)(i).

Moreover, the Court finds little merit in Plaintiff's argument that the ALJ erred in finding that RN Farmer's "opinion [was] unpersuasive due to no treatment notes from RN Farmer being submitted into the record" because the ALJ had a "heightened duty to develop the record." (Doc. 13 at 6–7). The Court acknowledges that ALJs have a heightened duty to develop the record where a claimant is not represented by counsel, as is the case here. *Celaya v. Halter*, 332 F.3d 1177, 1177 (9th Cir. 2003). However, as discussed above, the ALJ also found RN Farmer's statement "neither valuable nor persuasive" because "any statement that the claimant is unable to work is a decision of disability reserved to the Commissioner." (Doc. 9-3 at 37). This is a legitimate ground by

which an ALJ may reject a medical source statement. 20 C.F.R. § 404.1520(c)(3) ("Statements on issues reserved to the Commissioner" are "[e]vidence that is inherently neither valuable nor persuasive."); *Butch S. v. Kijakazi*, No. 421CV00405BLWDKG, 2023 WL 2168469, at *11 (D. Idaho Feb. 6, 2023) ("The ALJ properly found Butler's letter not persuasive because it opinioned only on the ultimate issue reserved to the Commissioner ... Butler's letter offered no opinion concerning Plaintiff's functional limitations [and] [t]herefore, it was not a 'medical opinion' that the ALJ was required to evaluate under the revised regulations[,] [r]ather, the letter concerned Plaintiff's ability to procure and maintain employment, which was neither valuable nor persuasive to the disability determination."). As such, even assuming arguendo that the ALJ did err in rejecting RN Farmer's statement due to a lack of corresponding treatment notes, any such error is harmless. *Molina v. Astrue*, 674 F.3d, 1104, 1115 (9th Cir. 2012) (stating an ALJ's error is harmless where it is "inconsequential to the ultimate nondisability determination").

## C. Other Work Existing in Significant Numbers in the National Economy

Plaintiff argues that the ALJ failed to meet her burden of showing at Step Five that there is a significant number of jobs in the economy that Plaintiff can perform within the limits of his assigned RFC. (Doc. 13 at 8). First, Plaintiff claims that the ALJ erred because three of the occupations she identified at Step Five ("order clerk, information clerk, and document preparer") are at "Reasoning Level 3," which exceeds the Reasoning Level consistent with Plaintiff's RFC ("Reasoning Level 2"). (*Id.* at 8–10). Second, Plaintiff argues that although the fourth and final occupation the ALJ identified at Step Five, "patcher," is at "Reasoning Level 2," consistent with Plaintiff's RFC, the "25,253 [patcher] jobs available in the national economy" is not a "significant number" sufficient to meet the ALJ's burden at Step Five. (*Id.*)

In support of his second argument, Plaintiff states that "there is no bright line rule" in the Ninth Circuit regarding what qualifies as a significant number of jobs in the national economy, emphasizing dicta in *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 529 (9th

Cir. 2014), where the court stated that an "ALJ's finding that 25,000 national jobs is sufficient presents a close call." (Doc. 13 at 11). Plaintiff also identifies other district courts in the Ninth Circuit that "have found numbers less than 25,000 to be insignificant." (*Id.*) (citing *Baker v. Comm'r of Soc. Sec.*, No. 1:13-cv-01350-SAB, 2014 WL 3615497, *8 (E.D. Cal. July 21, 2014) (holding 14,500 national jobs insignificant); *Valencia v. Astrue*, No. c. 11–06223 LB, 2013 WL 1209353, * 18 (N.D. Cal. Mar. 25, 2013) (holding 14,082 national jobs insignificant); *Michael B. v. Comm'r of Soc. Sec.*, Civ. No. 3:19-cv-00760-AA, 2022 WL 376031, *3 (holding 6,660 national jobs insignificant.)).

Plaintiff is correct that the Ninth Circuit has no bright line rule establishing what constitutes "a significant number of jobs" in the national economy for the purposes of determining disability at Step Five in the ALJ's analysis. *Nash v. Comm'r of Soc. Sec. Admin.*, no. CV-23-02018-PHX-JAT, 2024 WL 1550771, *8 (D. Ariz. Apr. 10, 2024) (citing *Gutierrez*, 740 F.3d at 528, 529). Hence, this Court must look to "exemplary decisions by the Ninth Circuit to determine an estimate for what constitutes a significant number of jobs in the national economy." *Id.* In *Gutierrez*, as Plaintiff points out, the Ninth Circuit stated that a total of 25,000 national jobs presented "a close call." 740 F.3d at 529. However, despite this, the court ultimately determined that a total of 25,000 jobs constitutes a significant number in the national economy "because it represents a significant number of jobs in several regions of the country." *Id.* Further, the other cases to which Plaintiff cites in support of his argument are unpublished decisions from district courts and are therefore persuasive, not binding, authority.

Thus, under the Ninth Circuit's precedent finding that a total of 25,000 national jobs is significant, and under its precedential deference to "an ALJ's supported finding that that a particular number of jobs in the claimant's region was significant," the Court concludes that a total of 25,253 "patcher" jobs represents a significant number of jobs in the national economy. *Nash*, 2024 WL 1550771, at *8 (reaching the same conclusion and providing the same reasoning regarding 129,000 total national jobs).

Consequently, even if, as Plaintiff argues, he is unable to perform the requirements

of the occupations of "order clerk, information clerk, and document preparer" because their Reasoning Levels exceed the Reasoning Level consistent with his RFC, work that Plaintiff could perform still exists in significant numbers in the national economy. As such, the ALJ committed no materially harmful error based on her finding to this end.

### IV.   CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the ALJ's decision is **AFFIRMED.**

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly.

Dated this 2nd day of December, 2024.

James A. Teilborg
Senior United States District Judge